RECEIVED
MAY 1 8 2006

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| MICHAEL R. HAWKINS, SR. | CIVIL ACTION NO. 05-1232 |
| VS. | JUDGE MELANÇON |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | MAGISTRATE JUDGE METHVIN |

## REPORT AND RECOMMENDATION

Michael Hawkins appeals the finding of the Commissioner that he was not disabled for purposes of obtaining social security benefits during the period beginning March 25, 2003. After full review of the administrative record and the briefs of the parties, the undersigned recommends that the decision of the Commissioner be **REVERSED**.

### *Background*

Born on January 23, 1953, Michael Hawkins is a 53-year-old claimant with a high school education.[1] Hawkins worked in the past as a brick layer and farmer. On October 15, 2001, Hawkins applied for Title II disability insurance benefits, alleging disability since June 26, 2000 due to mental problems and head, neck, back, arm, and leg injuries resulting from an on-the-job accident.[3] Following an administrative hearing on April 23, 2003, the Administrative Law Judge (ALJ) concluded that Hawkins had severe impairments which prevented him from doing his previous jobs and any other work from June 26, 2000 to March 25, 2003 and that Hawkins was therefore entitled to a closed period of disability benefits during that period. The ALJ concluded, however, that beginning March 25, 2003, Hawkins had medically improved, could perform other

---

[1] Tr. 347-348.

[3] Tr. 70, 358.

276 F.3d 716, 719-20 (5th Cir. 2002).[4] Pursuant to the standards, the Secretary may terminate disability benefits if substantial evidence demonstrates that: (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity. *See* § 423(f)(1); Griego v. Sullivan, 940 F.2d 942, 944 (5th Cir.1991). The burden of proof lies with the Secretary in termination proceedings. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Griego v. Sullivan, 940 F.2d 942, 944 (5th Cir.1991).

The first part of the evaluation process focuses on medical improvement. The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your impairment(s)." And a medical improvement is only related to an individual's ability to work "if there has been a decrease in the

---

[4] In Waters v. Barnhart, 276 F.3d 716, 719-20 (5th Cir. 2002), held:
In the typical disability case, a claimant's application for benefits is decided while he is under a continuing disability. Once the application is granted, payments continue in accord with that decision. Termination of the benefits then involves a subsequent hearing--a termination case--in which the Commissioner reviews (and decides whether to terminate) the continued payment of benefits. In contrast, in a closed period case, "the decision-maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision." *Pickett v. Bowen*, 833 F.2d at 289 n. 1. *Thus, in closed period cases, the ALJ engages in the same decision-making process as in termination cases, that is, deciding whether (or, more aptly, when) the payments of benefits should be terminated.*
(emphasis added).

As the court stated in Waters, "[t]he primary difference between the standard employed by the ALJ and the 'medical improvement' standard . . . is the allocation of the burden of proof. Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled." Waters, 276 F.3d at 718, citing 42 U.S.C. § 423(f); Griego v. Sullivan, 940 F.2d 942, 943-44 (5th Cir. 1991). In contrast, under the five-step sequential evaluation, the burden is on the claimant to show that his impairments prevent him from doing any work.

severity ... of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3).

The second part of the evaluation process relates to the ability to engage in substantial gainful activity. Here the implementing regulations incorporate many of the standards set forth in the regulations governing initial disability determinations. See 20 C.F.R. § 404.1594(b)(5) and (f)(7). The difference is that the ultimate burden of proof lies with the Secretary in termination proceedings. Griego v. Sullivan, 940 F.2d at 944. In evaluating the ability to engage in substantial gainful activity, the Secretary considers, first, whether the claimant can perform past relevant work and, if not, whether the claimant can perform other work. 20 C.F.R. §§ 404.1594(f)(7) and (f)(8).

In determining whether a claimant has regained the capacity to perform substantial gainful activity, the Secretary uses an eight-step sequential analysis:

> 1. If a claimant is engaged in substantial gainful activity, disability will be found to have ended regardless of the medical findings.
>
> 2. If the claimant's impairment meets the severity of an impairment listed in Appendix I, his disability will be found to continue.
>
> 3. If the impairment does not meet the Appendix 1 listings, whether there has been medical improvement as shown by a decrease in medical severity must be determined. If so, Step 4 is considered. If there has been no decrease in medical severity, there has been no medical improvement, and Step 5 is considered next.
>
> 4. If medical improvement is found, whether the improvement is related to the claimant's ability to do work must be considered. To make this determination, whether or not there has been an increase in the residual functional capacity based on the

impairment that was present at the time of the most recent favorable medical determination must be considered.

5. If it is found at Step 3 that there has been no medical improvement or at Step 4 that the medical improvement was not related to the claimant's ability to work, a determination as to whether the exceptions apply must be made. If none apply, disability will be found to continue. If one of the first group of exceptions to medical improvement applies, Step 6 is considered. If an exception in the second group of exceptions to medical improvement applies, the claimant's disability will be found to have ended.[5]

6. If medical improvement is shown to be related to the claimant's ability to do work or if one of the first group of exceptions to medical improvement applies, whether all the claimant's current impairments in combination are severe must be determined. The evidence shows that the current impairments in combination do not significantly limit the claimant's physical or mental abilities to do basic work activities, the impairments will not be considered severe and the claimant will no longer be considered disabled.

7. If the impairment is severe, and a claimant can still perform his past work, disability will be found to have ended.

8. If a claimant's impairment prevents him from performing his past work, other factors including his age, education, past work experience, and residual functional capacity are considered to determine if other work can be performed.

20 CFR Sec. 404.1594(f)(1-8)(1993).

---

[5] The second group of exceptions to medical improvement may be considered at any point in this process. They include:
    (1) A prior determination was fraudulently obtained;
    (2) The claimant does not cooperate with the SSA;
    (3) The SSA was unable to find the claimant; and
    (4) The claimant fails to follow prescribed treatment.
20 C.F.R. §404.1594(e)(1-4).

In the case at bar, the ALJ found that Hawkins suffers from the following severe impairments: right carpal tunnel syndrome; back pain; status post lumbar fusion; degenerative changes in the cervical spine; glaucoma in both eyes; and hypertensive cardiovascular disease. The ALJ concluded that Hawkins was disabled between June 26, 2000 to March 25, 2003 and entitled to benefits for his impairments during that period. However, the ALJ found that, after March 25, 2003, Hawkins had the residual functional capacity to perform light work with certain restrictions, and therefore was no longer disabled.

### *Findings and Conclusion*

After a review of the entire record and the briefs of the parties, and pursuant to 42 U.S.C. §405(g), I find that the Commissioner's finding of non-disability after March 25, 2003 is not supported by substantial evidence of record.

### I. Medical History

***Back impairment:*** On June 26, 2000, Hawkins fell at work and injured his back and neck. Hawkins went to Bunkie General emergency room and was prescribed medication.[6] In follow up, he was treated by Dr. John Tassin, a general practitioner, beginning June 30, 2000 for neck and back pain.[7] On January 9, 2001, Dr. Tassin referred Hawkins to Dr. Louis Blanda, an orthopedic surgeon.[8] Hawkins's back pain was a burning sensation radiating into the right posterior thigh and calf. An MRI taken on February 21, 2001 showed a right lateral herniated

---

[6] Tr. 109-112.

[7] Tr. 140-154.

[8] Tr. 129-131.

disc at L4-5 and mild bulging at L5-S1.[9] An EMG showed a pinched nerve on the right side at L5-S1.[10] In August, 2001, Hawkins began experiencing loss of bladder and bowel control. On September19, 2001, a lumbar spine myelogram showed "posterior disc bulging in abroad based fashion at the L3-4, L4-5 and L5-S1 levels . . . at the L4-5 level this is more the right and may be causing some pressure on the right L5 nerve root."[11]

On January 23, 2002, Hawkins underwent a "lumbar laminectomy, diskectomy L4-5 on the right, instrumented fusion using Spinetek pedicle screw system bilaterally, fusion bilaterally L4-5 and preparation of local graft."[12] On March 7, 2002, Dr. Blanda noted that the fusion was stable and that Hawkins indicated that the pain in his lower back and leg were much less than his pre-operation pain.[13] In May, 2002, Hawkins began physical therapy.[14] On December 24, 2002, Hawkins explained that although his back is better since the surgery, he still experienced low back pain.[15] On the same date, Dr. Blanda referred Hawkins to Dr. James Domingue, a neurologist, and noted that "He is to return in here for recheck in 2-3 months. The patient will probably be at MMI for his low back."[16]

---

[9] Tr. 125-127.

[10] Tr. 125.

[11] Tr. 121.

[12] Tr. 157.

[13] Tr. 310.

[14] Tr. 309.

[15] Tr. 305.

[16] Tr. 305.

On March 25, 2003, Dr. Blanda recommended that Hawkins undergo a functional capacity evaluation, which was scheduled for April 8, 2003.[17] Dr. Blanda was to re-examine Hawkins in July, 2003.

*Neck pain:* After his on-the-job accident, Hawkins described sharp pain in the right side of his neck radiating down into the elbow with numbness. An MRI was taken on February 21, 2001, showed degenerative disk at C6-7.[18] A cervical spine myelogram taken on September 19, 2001, showed a small central posterior disc bulge at C4-5 and mild hypertrophy at C5-6 and C6-7 causing mild encroachment on the neural foramen bilaterally.[19] In July, 2002, Dr. Blanda noted that Hawkins still complained of neck pain.[20] In December, 2002, Dr. Blanda referred Hawkins to Dr. Domingue, who concluded that Hawkins needed pain management in order to assist in treatment for his pain.[21] On February 20, 2003, Dr. Blanda referred Hawkins to Dr. Joseph Gillespie, an anesthesiologist who specializes in pain management.[22] On April 22, 2003, Dr. Gillespie prescribed Skelaxin (muscle relaxer), Lortab (pain relief), and Ultram (pain relief).[23]

---

[17] Tr. 302.

[18] Tr. 125-127.

[19] Tr. 120.

[20] Tr. 308.

[21] Tr. 303-305.

[22] Tr. 303-304.

[23] Tr. 93.

*Carpal Tunnel:* In February, 2001 an EMG showed right arm carpal tunnel syndrome.[24] On October 17, 2001, Hawkins underwent a right carpal tunnel release surgery at LGMC.[25] On November 13, 2001, Dr. Blanda noted that Hawkins was doing better concerning his carpal tunnel syndrome.[26]

*Glaucoma:* On July 23, 2001, Hawkins was examined by Dr. Edward Graul, an ophthalmologist, who noted that Hawkins has a history of advanced glaucoma in both eyes.[27] Hawkins' best corrected vision is 20/60 in the right eye and 20/20 in the left. Hawkins uses Alphagan eye drops and Xalatan. He has extensive visual field loss in the both eyes. Dr. Graul noted:

> Because of the visual status and the status of his visual fields, the patient would not be considered legally blind in either eye at this point. This is possible that as time passes, he may become legally blind in both eyes, especially if he fails to continue taking his medications. At this point based on his visual examination, he shows no evidence of loss of physical activities related to work such as sitting, standing, walking, lifting, carrying, or handling objects, hearing, speaking, and traveling. However it should be noted that because of his extensive visual field loss on the right eye, he does have some limitations in driving and has to be sure that he looks carefully to the right before entering intersections, as his visual field is so extensively damaged on that side.[28]

On March 19, 2003, Dr. Graul noted that Hawkins is restricted from being employed as a commercial driver.[29]

---

[24] Tr. 125.

[25] Tr. 138.

[26] Tr. 169.

[27] Tr. 161.

[28] Tr. 161.

[29] Tr. 282.

*Heart and stomach problems:* On October 22, 1999, Hawkins was examined at Bunkie General Hospital for headache and elevated blood pressure. He was placed on blood pressure medications. On December 10, 2002, Hawkins was seen at Bunkie General, complaining of his heart beating very fast and gas pains.[30] An x-ray of his chest and abdomen were normal.[31] On February 24, 2003, Hawkins was examined at Rapides Regional Medical Center complaining of stomach swelling for two months.[32] An x-ray was normal.

## II. Administrative Record

*Residual Functional Capacity Evaluation:* On April 4, 2002, the Social Security Administration ("SSA") had Sid Gusner, a non-examining and non-medical consultant, conduct a Residual Functional Capacity Assessment.[33] The consultant gave Hawkins a projected light residual functional capacity within 12 months of surgery.

*Hearing testimony:* During the administrative hearing on April 23, 2003, Hawkins testified that he has pain in his back, neck, legs, arms, and head. He explained that his back pain has improved since his surgery, "The pain before I had, it was almost unexplainable. And now, I have similar to the same thing but not as severe as it was before."[34] He has decreased strength in his right hand.[35] Hawkins testified that he gets headaches daily and he experiences gastritis as a

---

[30] Tr. 225.

[31] Tr. 227.

[32] Tr. 320-328.

[33] Tr. 171-178.

[34] Tr. 354.

[35] Tr. 356.

side-effect of his medications.[36] He grocery shops, drives, visits his sister, and watches television.[37] He is unable to lift 20 pounds and can walk only 20-30 minutes without rest.[38] Hawkins also testified that he has changed emotionally, "my nerves have got real bad since I got hurt, and I can't work and do like I used to do.... It's a different life once you get into a situation like I am."[39]

### III. ALJ's finding of non-disability after March 25, 2003

Hawkins maintains that the ALJ erred in finding that medical improvement had occurred in his condition only one month prior to the administrative hearing. Hawkins argues that there was no medical basis to support the ALJ's finding and that the ALJ erred in discounting his allegations of disabling pain.

The ALJ concluded that Hawkins was disabled between June 26, 2000 and March 25, 2003, the date that x-rays confirmed a solid back fusion from surgery:

> Prior to surgery he was incapacitated by severe back and leg pain with limited ability to sit or stand. He walked with a limp and required the use of a cane. He also had problems with bladder and bowel control and could not completely control urination. He remained in a recuperative state from surgery until March 25, 2003 when x-rays confirmed a solid fusion and he was referred for a functional capacity evaluation.[40]

The ALJ then addressed medical improvement, finding evidence of such from the fact that on March 25, 2003, Dr. Blanda requested a functional capacity evaluation of Hawkins:

---

[36] Tr. 357, 359.

[37] Tr. 360.

[38] Tr. 356-360.

[39] Tr. 364.

[40] Tr. 16.

It is also clear there was medical improvement in the claimant's back condition beginning March 25, 2003 and that such improvement was related to the ability to work. This conclusion is supported by Dr. Blanda's decision to schedule a functional capacity evaluation, suggesting he considered the claimant to be at maximum medical improvement at that time. The claimant's attorney was provided additional time to submit the functional capacity evaluation report by failed to do so. The undersigned feels that if the FCE report were supportive of allegations of continuing incapacity it would have ben submitted. The fact it was not, tends to weigh against such allegations.

There are few treatment records for the claimant's back condition after March 25, 2003. Dr. John Tassin noted some lumbar tenderness on March 27, 2003. Medication was prescribed including Ultram, Ibuprofen and Skelaxin. He did not mention back or leg pain when seen on April 14, 2003 suggesting medication was effective. A February 20, 2003 progress note from Dr. Blanda shows he was referred to Dr. Gillespie for pain management. There are no records from this physician other than an April 22, 2003 prescription for Skelaxin, Lortab, and Ultram. He was to see Dr. Blanda in June or July 2003; however, additional records from Dr. Blanda have not been produced.[41]

The ALJ concluded, therefore, that after March 25, 2003, Hawkins could perform light work that did not require right wrist range of motion greater than 80 degrees and that did not require good peripheral vision.[42] Relying on the testimony of a vocational expert, the ALJ concluded that Hawkins was not disabled because he could perform the jobs of non-construction laborer and production inspector/checker examiner.[43]

The record is void of any medical evidence supporting the ALJ's determination that after March 25, 2003 Hawkins could perform light work with additional limitations. Dr. Blanda *did not* find that Hawkins had reached maximum medical improvement and the ALJ's assumption otherwise is not supported by the record: "This conclusion is supported by Dr. Blanda's decision to schedule a functional capacity evaluation, suggesting he considered the claimant to be at

---

[41] Tr. 16, 17.

[42] Tr. 17, 18.

[43] Tr. 20.

maximum medical improvement at that time." The fact that Dr. Blanda referred Hawkins for a functional capacity evaluation ("FCE") does not indicate that Dr. Blanda thought that Hawkins had reached MMI. Moreover, even once Hawkins reached MMI, Dr. Blanda may not have found that he was capable of performing light work. In fact, the evidence shows that Hawkins continued to experience pain, in both his back and neck, to such a degree that Dr. Blanda referred him to Dr. Gillespie, a pain management specialist. Dr. Gillespie prescribed two painkillers and a muscle relaxer for Hawkins *after* March 25, 2003. Thus, the ALJ's decision is not supported by the medical records.

Additionally, it is important to note that the record is void of *any* medical evidence indicating that Hawkins can perform light work. The ALJ did not order a consultative examination, nor did he request that Dr. Blanda complete a residual functional capacity assessment. In fact, the only evidence that indicates that Hawkins can perform light work is the residual functional capacity ("RFC") form, which is not a medical record, completed by a consultant in April, 2002. In that form, the consultant projected that by January, 2003 Hawkins would be able to perform light work.[44] This consultant is not a physician, nor did he examine Hawkins, and, since his report is only three months after Hawkins's surgery, the consultant did not have the medical records concerning his ongoing pain after the surgery. Additionally, the consultant's report is suspect, since he did not find that Hawkins' severe eye impairments nor his carpal tunnel syndrome placed any limitations on his ability to perform light work.[45]

---

[44] Tr. 171-178.

[45] An ALJ cannot rely on the opinion of a non-examining consultant over that of a treating specialist. See, e.g., Barbee v. Barnhart, 2002 WL 31688886, *2 (5th Cir. 2002), citing Newton v. Apfel, 209 F.3d 448, 456-57 (5th Cir.2000) (cannot rely on opinion of non-examining physician over that of treating specialist).

Considering the foregoing, the undersigned concludes that the RFC form does not amount to substantial evidence in support of the ALJ's decision.

Further, the ALJ erred in discounting Hawkins's credibility regarding his pain. The ALJ discounted Hawkins claim that he cannot work due to his impairments because he grocery shops, drives a vehicle with a standard transmissions, tends to four goats, did not appear to be in pain, and he was "prescribed Viagra on a regular basis suggesting he is somewhat more active than he would have one believe."[46]

The fact that Hawkins is able to perform limited daily functions does not indicate that he was not in severe and chronic pain. Moreover, the medical evidence supports Hawkins's allegations of pain: he underwent a disckectomy and laminectomy with a fusion, carpal tunnel syndrom release, and is undergoing a pain management regime in an attempt to control his unremitting pain.

As discussed above, the ALJ's decision must be supported by substantial evidence. An ALJ may not "pick and choose" only that evidence which supports his decision, but must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. Armstrong v. Sullivan, 814 F.Supp. 1364, 1373 (W.D. TX 1993), citing, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir.1983); Rivera v. Sullivan, 771 F.Supp. 1339, 1351, 1354, 1356 (S.D.NY 1991). Additionally, the ALJ has the discretion to order a consultative examination. Jones v. Bowen, 829 F.2d 524 (5th Cir. 1987). An examination at government expense is not required "unless the record establishes that such an examination is necessary to

---

[46] Tr. 18.

enable the administrative law judge to make the disability decision." Turner v. Califano, 563 F.2d 669 (5th Cir. 1977).

I conclude, therefore, that the ALJ improperly discounted Hawkins's allegations of disabling pain. This, combined with the fact that the ALJ's articulated reasons for finding medical improvement are not supported by the record, renders the ALJ's determination of non-disability after March 25, 2003 unsupported by substantial evidence. The record does not include any medical evidence indicating that on March 25, 2003, the severity of Hawkins's condition and symptoms decreased. Accordingly, I recommend that the Commissioner's decision be reversed.

### *Conclusion*

The ALJ's finding that Hawkins had medical improvement after March 25, 2003, which enabled him to perform light work is not based on substantial evidence.

Remand is appropriate only upon a showing of "good cause," which includes an "inability to make a definitive ruling concerning a claimant's disability based on the record before the court." Ferguson v. Schweiker, 641 F.2d 243, 250, n. 8 (5th Cir.1981).

Because I find that the record does not establish that Hawkins had medical improvement after March 25, 2003, and the ALJ found that prior to March 25, 2003 Hawkins was disabled, it is not necessary to remand the case because the record establishes that Hawkins's disability continued after March 25, 2003. Accordingly,

**IT IS RECOMMENDED** that the ALJ's decision of non-disability after March 25, 2003 be **REVERSED** and judgment be rendered in favor of Hawkins for benefits consistent with a continuation date of March 25, 2003.

16

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana on _____, 2006.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, LA 70501
(337) 593-5140    FAX 593-5155